JOHN W. NONEMAN and MARCELLE E. NONEMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Noneman v. Commissioner
Docket No. 9709-75.
United States Tax Court
T.C. Memo 1980-109; 1980 Tax Ct. Memo LEXIS 476; 40 T.C.M. (CCH) 99; T.C.M. (RIA) 80109; April 9, 1980, Filed Richard G. Danner, Jr., for the petitioners. Helen T. Repsis, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined *477 deficiencies in petitioners' Federal income taxes for the years 1972 and 1973 in the amounts of $4, 117.56 and $5,018.66, respectively, and additions to tax under section 6653(a), I.R.C. 1954, [1] in the amounts of $205.88 and $250.93, respectively. The issues for decision are (1) whether petitioner husband's 1972 and 1973 travel expenses in connection with his employment in Detroit, Michigan, are ordinary and necessary employee business expenses incurred while away from home in the pursuit of business, and (2) whether petitioners' 1972 moving expenses were incurred in connection with the commencement of work at a new principal place of work. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, John W. Noneman, resided in Falls Church, Virginia, and petitioner, Marcelle E. Noneman, resided in Dallas, Texas, at the time of filing their petition in this case. Petitioners, husband *478 and wife, filed joint Federal income tax returns for the calendar years 1972 and 1973 with the Internal Revenue Service Center in Austin, Texas. Mr. Noneman (petitioner) upon graduation from high school in 1953 was employed to work with computers by a subsidiary of American Electric Power Service Corporation in Portland, Indiana. In 1961, petitioner moved to Canton, Ohio, and was employed by another subsidiary of American Electric. Beginning in 1961, petitioner's position was that of a computer programmer, designing customer software systems such as billing and accounting. By 1971, he was supervisor of programming for the American Electric subsidiary in Canton and lived there with his wife and children. In September of 1971, petitioner was telephoned by Mr. Wayne Hall about employment as a consultant with Leasco Systems Corporation (Leasco), a consultant firm specializing in computer software for utilities. Petitioner understood that the position required frequent travel. In October of 1971, Leasco had three consulting contracts--(1) Public Service Company of Oklahoma (Public Service) in Tulsa, Oklahoma, (2) Illinois Power Company in Decatur, Illinois, and (3) the Detroit-Edison *479 Company (Detroit-Edison) in Detroit, Michigan. Each of the contracts were signed with the expectation that the job would be completed within a year after it was started. The nature of consulting contracts as opposed to turnkey projects for utility software systems was such that the contracts were normally short in duration, i.e., less than a year. The home office of Leasco was in Oakbrook, Illinois, near Chicago, Illinois. The majority of Leasco employees lived in the Chicago area. On September 18, 1971, petitioner flew to Chicago for an interview, and on October 18, 1971, he began employment with Leasco. [3]
Petitioner on Monday, October 18, 1971, flew to Detroit to work on the Detroit-Edison project and on Friday, October 29, 1971, flew back to Canton. The following five weeks petitioner worked in Tulsa on the Public Service *480 project, commuting back to Canton each weekend except one. On Monday of the following week, November 29, 1971, [4] petitioner flew to Detroit from Canton. From that week until June 7, 1972, petitioner worked exclusively in Detroit, traveling there most Mondays and returning to Canton most Fridays. The contract between Detroit-Edison and Leasco was signed on May 3, 1971. In pertinent part, it provided as follows: CONTRACT WITH LEASCO SYSTEMS CORPORATION TO PROVIDE A FEASIBILITY STUDY AND DESIGNATED RELATED PRELIMINARY SERVICES NECESSARY FOR THE IMPLEMENTATION OF A COMPLETE CUSTOMER INFORMATION SYSTEM
This agreement is by and between Leasco Systems Corporation (CONTRACTOR), * * * Oakbrook, Illinois and The Detroit Edison Company (EDISON), * * * Detroit, Michigan
ARTICLE I. WORK TO BE DONE AND DOCUMENTS FORMING THIS CONTRACT
A. CONTRACTOR agrees to conduct a feasibility study and related preliminary services necessary for the implementation of a complete Customer Information System in accordance with so much of CONTRACTOR'S *481 proposal to EDISON dated January 25, 1971, as is attached, hereto, and the following provisions. * * *
D. It is agreed that Mr. Wayne Hall will apply a minimum of 40% of his working time and Mr. James Schlesser will apply 100% of his working time toward the Study. Should Messrs. Hall or Schlesser become unavailable or unable to perform the required services for EDISON through no fault of either CONTRACTOR or EDISON, any substitute for their services will require the written authorization and approval of EDISON. * * *
ARTICLE II. SCHEDULE
A. The services for the study contracted for will be commenced by CONTRACTOR within 10 calendar days of signing this agreement and will be completed within 90 days unless the completion date is extended by mutual agreement of the parties hereto. B. It is agreed that the services contracted for will be complted to the satisfaction of EDISON. The study is to be considered completed when the final report is submitted to and accepted by Mr. J. Douglas Elliott or his particularly named delegate. EDISON agrees that it will not unreasonably withhold its acceptance and approval thereof. ARTICLE III. PRICE
A. CONTRACTOR *482 will be compensated a lump sum for the complete study, not to exceed $30,000 plus authorized out-of-pocket expenses. If CONTRACTOR performs the study within the $30,000 target cost estimate, EDISON and CONTRACTOR will share equally in the savings. Examples of out-of-picket expenses are travel, living, telephone expenses, data processing equipment, time and supplies and these are estimated to be about $3,500 during the term of the study only. B. Invoices for the foregoing services and expenses will be submitted directly to the Project Director by CONTRACTOR monthly. Such invoices will detail each item of expense including the name, positions, numbers of hours worked and appropriate billing rates and, where applicable, suppliers invoices will be attached. EDISON will make payment within 15 days after acceptance by EDISON of the invoice. ARTICLE IV. OPTION FOR COMPLETE INSTALLATION AND IMPLEMENTATION OF A CUSTOMER INFORMATION SYSTEM
A. CONTRACTOR has provided EDISON with a preliminary estimated cost for the complete installation and implementation of a Customer Information System as outlined below. (1) Batch System Updating File Inquiry Capability Order Entry Capability *483 On-Line File Update Capability $225,000 (2) Field Order Dispatching 25,000 / $250,000 Plus expenses estimated at $30,000 EDISON may, at any time during and within 90 days after completion of this study, exercise the option to have CONTRACTOR design, develop, test, document and provide the computer programs for either item (1) above or items (1) and (2) above, and assist in the conversion and installation of item (1) above or items (1) and (2) above in accordance with appropriate specifications, documentation, schedules, etc. submitted by CONTRACTOR and approved by EDISON for the lump sum price of $225,000 plus expenses for item (1) above or for the lump sum price of $250,000 plus expenses for items (1) and (2) above. A list of typical expense items are attached as Exhibit A. Invoices for the services and expenses provided for in this Article IV A will be submitted directly to the Project Director by CONTRACTOR monthly. As to out-of-pocket expenses, such invoices will detail each item of expense, and, where applicable, supplier's invoices will be attached. As to the payment of CONTRACTOR'S service price stated in items (1) and (2) of this Article IV A, EDISON shall pay CONTRACTOR *484 monthly amounts computed by dividing (a) the amounts set forth in such items (1) and (2) corresponding to the services selected by EDISON to be performed, by, (b), 12. Such amounts shall be payable in eleven (11) consecutive equal monthly installments commencing thirty (30) days after exercise by EDISON of its option contained in Article IV A and the 12th monthly installment shall be payable by EDISON after acceptance of the CIS as provided in Article XI. All prices stated are in addition to any applicable sales or use taxes. B. During the installation of the CIS, CONTRACTOR will furnish EDISON written reports of the current status of the project on a monthly basis. The report will include a revision of activities and progress to date, identification of problem areas, planned upcoming activities and a statement as to whether the project is on schedule. The report will indicate causes for delay and suggested remedial action. C. CONTRACTOR agrees that to the best of its ability all programs will be debugged and will provide routine program maintenance for all programs which have been accepted as part of the Customer Information System for a period of 60 days after the date *485 of acceptance. CONTRACTOR will be entitled only to out-of-pocket expenses during this period. D. CONTRACTOR may at its option at any time terminate this Contract upon 10 days written notice to EDISON if the aggregate cost to CONTRACTOR of providing services hereunder, determined at CONTRACTOR'S Standard and Time and Materials Rates, exceeds $300,000 more than the aggregate monthly payments provided for under this Contract. E. It is understood and CONTRACTOR agrees that Mr. Wayne Hall will be CONTRACTOR'S Project Manager should EDISON exercise its option for the implementation of the CIS and that CONTRACTOR will use its best effort to insure that the study personnel are used during the implementation of the CIS. ALL of CONTRACTOR'S personnel will be subject to the approval of EDISON which consent by EDISON shall not unreasonably withheld. F. It is understood and EDISON agrees to the following: 1. EDISON would provide at least 2 to 4 systems and programming personnel to work on the project. 2. Programming by CONTRACTOR'S personnel will be done either in Chicago or Detroit upon the recommendation of the CONTRACTOR and approval of EDISON. 3. CONTRACTOR will provide *486 tested and documented programs and EDISON will provide the data and user procedure manuals.
4. The lump sum price submitted by CONTRACTOR is based upon the use of the following: (a) IBM 360 or 370 computer system (b) IBM Operating System in use by EDISON at the time CIS is installed (c) COBOL will be the primary programming language with exceptions subject to approval by EDISON (d) IBM CICS for sub-task control ARTICLE V. ADDITIONS
EDISON may from time-to-time request CONTRACTOR to perform additional services in connection with the study or development and installation of a Customer Information System other than those services set forth above, upon submission to CONTRACTOR of a written order specifying the additional services to be rendered by CONTRACTOR. It is agreed that CONTRACTOR shall be entitled to compensation for such additional services at hourly rates in effect at the time or at an agreed-to fixed fee. Present hourly rates are: Managers - $40/hour Professionals - $30/hour * * *
ARTICLE VIII. CANCELLATION, PATENT AND ASSIGNMENT
A. EDISON shall have the right to terminate this Agreement upon 30 days written notice to CONTRACTOR. CONTRACTOR *487 shall be entitled to payment of all charges and expenses due or incurred up to the date of termination. * * *
E. This Contract may be terminated upon ten (10) days' prior written notice by CONTRACTOR to EDISON in the event that EDISON shall fail to perform any of its obligations under this Contract, including without limitation, the failure to make payments or the failure to provide the materials, articles, or other input data as required under this Contract, and such failure shall continue for more than fourteen (14) working days after CONTRACTOR shall have demanded the payment or performance thereof. Either party shall be excused from timely performance under this Contract for the number of days that such failure to perform is attributable to acts of God or other events beyond the control of such party. CONTRACTOR shall be entitled to payment of all changes and expenses due or incurred up to the date of termination. * * *
ARTICLE XI. ACCEPTANCE
If the option included in Article IV A is exercised by EDISON, and after CONTRACTOR notifies EDISON that the computer programs comprising the Customer Information System (CIS) have been developed and tested in accordance *488 with IV A, EDISON shall furnish to CONTRACTOR a mutually agreed-to test problem of a magnitude sufficient to test all facets of the CIS so as to provide a clear indication of satisfactory performance. Following testing of the CIS, the CIS shall be deemed accepted by EDISON unless EDISON shall give notice of rejection specifying reasons therefor to CONTRACTOR within thirty (30) days after CONTRACTOR tests the CIS and notifies EDISON that the CIS is ready. If the acceptance test is not successful, CONTRACTOR will continue his best efforts to correct the deficiencies in the CIS so that a successful testing can be accomplished. If no such acceptance test problem is provided within thirty (30) days from CONTRACTOR'S request, the CIS will be deemed accepted when delivered. The study called for under articles I, II, and III of the above contract was completed in September of 1971. In October of 1971, Leasco began work on the installation and implementation of a customer information system for Detroit-Edison as provided for under the contract in articles IV and subsequent paragraphs. When petitioner finished in Tulsa and began work in Detroit during the last week of November 1971, *489 it was expected that the Detroit-Edison project would be completed no later than October of 1972. Had he been needed by Leasco at another project, petitioner could have been sent there by Leasco.In general, consulting positions with Leasco required constant travel. It was not the practice of Leasco to move employees to the project cities. However, at the beginning of petitioner's work on the Detroit-Edison project some mention was made to petitioner that he could move to Detroit rather than remain in Canton and have his traveling expenses to Detroit paid by his employer. Whether Leasco would have paid for the move to Detroit was never discussed, because petitioner remained in Canton with the understanding that his travel expenses to Detroit would be paid by Leasco and that he could return home each weekend. No mention had been made to petitioner about moving to Tulsa in connection with the project on which petitioner worked for five weeks in 1971 in Tulsa. Petitioner's assignment on the Detroit-Edison project was developing computer programs for customer accounting systems, as well as guiding and assisting Detroit-Edison personnel in their efforts in the same area. While on *490 the Detroit-Edison project, petitioner worked under Mr. Nelson Hamrick, the manager of the utilities group in Leasco, and Mr. Wayne Hall, the Detroit-Edison project manager for Leasco. Although they did not supervise his day-to-day activities, petitioner did report to them periodically to review the progress of the project. In June of 1972, petitioner and Leasco expected the Detroit-Edison project to be completed by the end of 1972. The extended completion date was, among other things, caused by changes in personnel at both Leasco and Detroit-Edison and some design changes in the systems being installed and implemented. By the first half of 1972, it became clear to Mr. Hamrick and Mr. Hall that petitioner's location in Canton created a problem with respect to air travel. Because of the limited airline service available from Canton, it was very difficult for petitioner to complete a full five days of work at an assigned worksite and get home for the weekend. Because of the travel required of its employees, it was the policy of Leasco to encourage each of its employees to live at a location where he could have airline service available to enable him to spend the full weekend with *491 his family while working full days on Mondays and Fridays at the project site. Representatives of Leasco therefore asked petitioner to move from Canton. Although any of the large airline centers such as Atlanta, Chicago, or Dallas would have been acceptable from a convenience point of view, Leasco had proposals with utility companies in Dallas, Tulsa, and Kansas City and the possibility of a merger with another Dallas software consultant for utilities, Systems Resources, Incorporated. Therefore, Mr. Hall asked petitioner to move to Dallas but did not specify when petitioner was to move. Petitioner did move to Dallas in June of 1972. After the move to Dallas, petitioner continued to work on the Detroit-Edison project. Petitioner worked on that proect from June 19, 1972, until the end of the year. However, during the last six months of 1972 petitioner was not reimbursed for the cost of the Dallas-to-Detroit and back weekly flights to the extent that the costs thereof exceeded the Canton-to-Detroit and back flight costs. Petitioner was of the opinion that the reason he was not reimbursed for the excess cost of air fare from Dallas to Detroit over the Canton-to-Detroit fare was *492 because under the contract which Leasco had with Detroit-Edison until the end of 1972 Leasco could not receive reimbursement for this additional cost from Detroit-Edison. It was the policy of Leasco to allow its employees to move at a time when it was personally convenient, and petitioner found it convenient to move in June partially because of his children's school schedules. Petitioner in May of 1972 incurred initial relocation expenses of $606.78 while house hunting in Dallas.In June of 1972, petitioner incurred relocation expenses of $1,307.09 in moving from Canton to Dallas. During 1972, petitioner was reimbursed $9,401.79 for transportation, meals and lodging expenses he incurred in Detroit and for his travel expenses incurred between Canton or Dallas and Detroit. Un-reimbursed was $2,542 of air travel expenses from Dallas to Detroit. Additionally, petitioner was reimbursed $1,891.80 for his expenses incurred in moving from Canton to Dallas. [5]
*493 On May 25, 1973, Leasco signed a new contract with Detroit-Edison effective January 1, 1973. In pertinent part it read as follows: CONTRACT FOR SERVICES RELATED TO USE OF DATA PROCESSING PRODUCTS
The Leasco Systems Corp. (LEASCO) and the Detroit Edison Company (EDISON) agree that the following terms and conditions shall govern in all cases when LEASCO is requested to furnish to EDISON any services in connection with the use of data processing products other than services performed under EDISON Contract No. C-171010, dated April 28, 1971. ARTICLE I. GENERAL CONDITIONS AND SCOPE
A. CONTRACTOR'S Responsibilities
* * *
2. Maintain at all times a sufficient number of competent and fit workmen to complete the job properly and timely (time being of the essence of the Contract) and at all times (a) maintain strict discipline under established work rules and procedures and (b) establish and enforce strict compliance with all health and safety rules and procedures required by law or generally accepted in CONTRACTOR'S industry or trade. * * *
c. Suspension of Work
1. EDISON may, at any time, direct CONTRACTOR to suspend all or any part of its *494 work, and CONTRACTOR may, but not be required to resume any suspended work as soon as possible after notice to do so from EDISON, provided that any provision of the Contract affected by and such suspension shall be equitably adjusted. * * *
F. Service Estimates
Estimates of services to be rendered under this Contract may be agreed to in writing. No estimates are guaranteed in any way or to any extent by LEASCO, and do not change this Contract to a fixed price contract. LEASCO will, however, notify EDISON immediaely if the estimate will be exceeded. EDISON may within five days of such notice terminate the services, paying only for effort expended to that time. * * *
H. Miscellaneous
* * *
4. The Contract, and the rights, obligations and liabilities of the parties thereto, will be construed pursuant to the law of the State of Michigan. 5. The Contract is binding upon, and will inure to the benefit of EDISON and the CONTRACTOR and their respective assigns, successors, subcontractors, heirs, executors, administrators, receivers and other representatives. I. Scope of Services
1. This Contract shall cover all services in connection with *495 the use of data processing products by LEASCO personnel, including but not limited to, studies, systems analysis and design, programming, implementation planning and installation evaluation. These services may be performed at either EDISON or LEASCO premises. 2. LEASCO shall provide these services in the amount, extent and character in accordance with requests of the Director of the Administrative Systems Planning initiated and signed by the Director with copies to LEASCO and EDISON Purchasing. 3. Work performed under this contract initially shall be in three phases, under the direction of EDISON personnel which may or may not run concurrently. a. Monthly billing development, programming and implementation - All work performed in this area shall be as stated in the MONTHLY BILLING STUDY Report dated March 14, 1973 * * *. b. Write the programs for and implement an interim (approximately April, 1973) and a final (approximately August, 1973) rate change in EDISON'S CIS system. c. Assist EDISON personnel in the analysis, programming and implementation in the CIS system, other related systems such as primary, steam, deposit, T.L.M., street lighting, merchandise, *496 sundry and combined billing. ARTICLE II. SCHEDULE
This Contract will be in effect from January 1, 1973 to December 31, 1974. Upon reaching this expiration date if it is agreed by both EDISON and LEASCO this Contract may be extended at that time. EDISON retains the right to terminae this Contract with or without cause upon thirty (30) days prior written notice to CONTRACTOR. Upon termination without cause, CONTRACTOR will be reimbursed for all direct labor costs plus a negotiated overhead and profit mark-up on materials and labor used prior to termination. No allowance will be made for anticipated profit on work remaining to be done as of the termination date. ARTICLE III. COMPENSATION
LEASCO professional personnel shall be compensated at their hourly payroll cost plus 135% mark-up in accordance with the attached schedule (* * *). LEASCO Managers shall be compensated at the fixed hourly rate of $40.00. Hourly payroll costs are subject to change from time to time to reflect changes in wage rates, payroll taxes and/or employees benefits. The Contract will be revised periodically to incorporate these changes provided they are approved by EDISON. LEASCO *497 shall be reimbursed incidental costs and reasonable expenses at actual cost to them. LEASCO shall obtain EDISON'S written agreement for reimbursement of cost or expenses incurred of other than a routine nature. Being as the pricing of the Contract, or any Contract Change, is on a cost-plus or time and material basis, LEASCO must furnish Daily Time Sheets and Material Delivery Tickets to EDISON'S CIS Project Director, and/or his delegate, each day for approval. A copy of these records is to be left with EDISON'S CIS Project Director and/or his delegate and a copy is also to accompany all invoices for the work. Petitioner's duties under the second contract concerned preparation of the data for the April 1973 and August 1973 rate proposals and the actual implementation of the new rates. Although rate changes for public utilities are predictable, petitioner's work on Detroit-Edison's rate proposals had not been expected when petition was first assigned to the Detroit-Edison project. Under the second contract, it was petitioner's expectation that he would be finished with the project after completion of the work with respect to the second rate proposal in August 1973. Petitioner *498 did not expect to work on the Detroit-Edison project for the two-year duration of the second contract. From the beginning of 1973 until Saturday, June 16, 1973, petitioner continued to work on the Detroit-Edison project. [6] On June 16, 1973, petitioner flew to Tulsa, Oklahoma, from Detroit or Dallas to work on the Public Service project. He then flew to Detroit on Wednesday, June 20, 1973, returning home that weekend. Petitioner then worked in Detroit for 12 of the next 13 weeks [7] ending on September 28, 1973. During that period, petitioner did work in Tulsa on the Public Service project on one Monday, July 23, 1973. Petitioner was reimbursed $14,638.37 for his 1973 transportation, meals and lodging expenses in Detroit and his total 1973 travel expenses to and from Detroit, including the full amount of the Dallas-to-Detroit air fare. *499 On October 26, 1973, Leasco was acquired by Tres Computer Systems, Inc. For the rest of 1973, petitioner worked in the Tres office in Dallas on some preliminary matters for the Public Service project and then worked in Tulsa on the Public Service project three or four months before beginning work for six months in Syracuse, New York, on a project for Niagara Mohawk. On his 1972 Federal income tax return, petitioner deducted $2,542 for his air travel between Detroit and Dallas as a business expense. He did not report as income the $11,293.59 he received as reimbursed employee expenses nor did he deduct such amounts on his 1972 return. On his 1973 Federal income tax return, petitioner did not report as income the $14,638.37 he received as reimbursed employee expenses nor did he deduct such amounts. In the notice of deficiency for the taxable years 1972 and 1973, respondent increased petitioner's income to include reimbursements received from Leasco of $11,293.59 and $14,638.37, respectively. Additionally, in the notice of deficiency for 1972, respondent disallowed petitioner's deduction for unreimbursed travel expenses of $2,542. OPINION The first question presented *500 is whether petitioner's reimbursed 1972 and 1973 travel expenses in connection with the Detroit-Edison project are ordinary and necessary employee business expenses incurred while away from home in pursuit of business. To the extent that these reimbursements are ordinry and necessary business expenses, if they were included in petitioner's income, they would be deductible. Section 162(a)(2) provides: (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * *
(2) traveling expenses (including amounts expended for meals and loading other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business * * *. [8]
*501 Therefore, in order to show that the reimbursements if included in income would be deductible petitioner must establish that the Detroit-Edison travel expenses were (1) ordinary and necessary, (2) incurred while away from home, and (3) incurred in the pursuit of a trade or business. Commissioner v. Flowers,326 U.S. 465, 470 (1946). Respondent's primary argument is that none of petitioner's travel expenses were incurred while away from home because petitioner' employment in Detroit was not temporary. In the alternative, respondent argues that even if the employment was temporary, a portion of petitioner's travel expenses were not incurred in he pursuit of a trade or business because petitioner had no business purpose for moving to Dallas. Lastly, respondent argues that even if the employment was temporary and the move to Dallas was ultimately incurred in the pursuit of a trade or business, the travel expense deduction should not include the excess costs of the Dallas-to-Detroit and return trips over the Canton-to-Detroit and return trips because petitioner moved to Dallas at the time he did as a matter of his personal convenience. Petitioner contends that the *502 Detroit employment was temporary and that all the travel expenses were incurred in the pursuit of a trade or business. The rationale for the section 162(a)(2) deduction for living expenses incurred while away from home is to mitigate duplicate living expenses where a taxpayer, because of the exigencies of his trade or business, must maintain two places of abode. Tucker v. Commissioner,55 T.C. 783, 786 (1971). We have held that under section 162(a)(2), a taxpayer's home is considered his principal place of employment. Daly v. Commissioner,72 T.C. 190, 195 (1979). However, the principal place of employment is not the taxpayer's home within the meaning of section 162(a)(2) where the employment is temporary rather than indefinite, indeterminate or substantial in duration. Garlock v. Commissioner,34 T.C. 611, 614-615 (1960); Curtis v. Commissioner,449 F.2d 225, 227 (5th Cir. 1971), affg. a Memorandum Opinion of this Court. Whether employment is temporary is a question of fact to be decided from a consideration of all the circumstances of each case. Peurifoy v. Commissioner,358 U.S. 59, 61 (1958); *503 Curtis v. Commissioner,supra at 227. Under the facts and circumstances of this case, we find that petitioner's employment in Detroit was temporary. When petitioner began work on the Detroit-Edison project in late November of 1971, both petitioner and his employer expected the project to be completed within the next 11 months. Consulting projects like the Detroit-Edison project normally take less than a year to complete. In fact, each of the three Leasco projects in October of 1971 were expected to last for less than a year. None of the Leasco employees lived at any of the project sites and Leasco did not encourage them to move to the project sites. Rather, Leasco employees were mostly located in the Chicago area or encouraged to live near another large airport with convenient flights to project cities. Petitioner's position as a consultant was such that he could be called from one project to another if Leasco found it beneficial. The Detroit-Edison project, however, was expected to be his primary work until its completion. Officials of Leasco had discussed with petitioner at the beginning of his participation in the project whether he wanted to move *504 to Detroit even though it was not the policy of Leasco to move employees to the project site. By June of 1972, the Detroit-Edison project had been delayed by unexpected losses in personnel and changes in the design of the systems for the project.At that time, it was expected that the project would be completed by the end of 1972. Because petitioner's flight schedules to and from Canton were not convenient, Leasco supervisors concluded that it would be better if petitioner lived near a major airport such as Atlanta, Chicago, or Dallas. This matter was discussed with petitioner. Leasco had several possible projects in the southwest and a possible merger with a firm in Dallas. Therefore, petitioner was asked to move to Dallas. Following a house hunting trip in May, petitioner moved to Dallas in June of 1972. Sometime in the beginning of 1973, petitioner began working on a project involving a rate change proposal for Detroit-Edison. A second contract between Leasco and Detroit-Edison was signed on May 25, 1973, effective as of January 1, 1973. It was under this contract that petitioner worked on the rate change proposals for April and August of 1973. These proposals were *505 not envisioned under the original contract nor expected to be a part of the Leasco Detroit-Edison project when petitioner began work on the Detroit-Edison project. In fact, it was not until about the beginning of 1973 that it was determined that petitioner would work on the rate change project for Detroit-Edison. Although the second contract covered a two-yer period, the rate proposals upon which petitioner was to work were to be finished around August of 1973. Petitioner ended his work on the Detroit-Edison project on September 28, 1973. Although he worked almost continuously on the Detroit project for nearly two years, petitioner at no time believed, nor did he have any reason to believe, that he would continue in Detroit for as much as a year from that time. Also, at no time did petitioner's employer contemplate keeping him in Detroit for as much as a year. We therefore find the employment of petitioner in Detroit to have been temporary under our holdings in Michaels v. Commissioner,53 T.C. 269 (1969), and Dowd v. Commissioner,37 T.C. 399 (1961). In Dowd, the taxpayer lived in Seattle, Washington, and worked there as an assistant *506 professor at the University of Washington. On March 5, 1955, he was awarded a 10-month Fulbright grant to lecture on economics at Kobe University in Kobe, Japan, beginning in October of 1955. In September, he was promoted to associate professor and given sabbatical leave for the coming academic year. The taxpayer rented his home in Seattle and on September 22, 1955, moved with his family to Kobe, Japan, where he rented a house and began to lecture at Kobe University. In March of 1956, the taxpayer resigned from the University of Washington faculty effective June 15, 1956. On May 3, 1956, the taxpayer was awarded a renewal of his Fulbright grant, beginning in October of 1956 for another 10 months. On May 18, 1956, he was awarded an extension of his original grant giving him employment in Kobe during the two summer months between his grants. While in Japan, the taxpayer on April 4, 1957, was offered an appointment as a lecturer at the University of Michigan for the 1957-1958 academic year. He accepted and began employment there on October 1, 1957. We held that during his 21-month stay in Kobe, Japan, the taxpayer's employment was temporary. In Michaels, the taxpayer was *507 a cost analyst for Boeing Company, employed and living in Seattle, Washington. His position often required short-term (five weeks and less) travel o various locations throughout the United States to audit and analyze the records of suppliers that did business with Boeing Company. In 1964, the taxpayer was assigned to Los Angeles to inspect the books and records of a number of suppliers located in that area. He was told that the assignment would last approximately one year. The taxpayer rented his Seattle home and in June of 1964 moved with his family to Los Angeles where he rented a house. In March of 1965, Boeing Company informed the taxpayer that he had won a promotion and that he was to remain in Los Angeles to establish a permanent office. We held that until March of 1965 the taxpayer's employment in Los Angeles was temporary. We reasoned as follows: When petitioner was assigned to the Los Angeles area, he was told that his assignment was for only 1 year. Furthermore, at the time he was assigned, Boeing did not have a permanent office for cost analysis in Los Angeles. Not until March 1965, when petitioner was recalled to Seattle, did petitioner have reason to know that *508 his employment in Los Angeles was other than temporary. Moreover, petitioner's decision not to sell his house in Seattle and to leave some of his furniture there suggests to us that he believed that his stay in Los Angeles would be brief and that he would be returning to Seattle. A period of 1 year seems to us both sufficiently lengthy to explain petitioner's decision to bring his family to the Los Angeles area and sufficiently brief to justify his decision to retain his house in Seattle. [Michaels,supra at 273.] It was petitioner's reasonable expectation that his employment in Detroit would be finished within 11 months when he began the project in November of 1971. Similarly, when in June of 1972 it became clear that the project was behind schedule, petitioner's reasonable expectation was that the project would be completed in six months. Finally, when petitioner began to work under the second contract in early 1973, he reasonably expected to be finished within eight or nine months. Thus, under the holdings in Dowd and Michaels, we find the employment of petitioner in Detroit was temporary at all times here in issue. Respondent argues that *509 it is not only essential that the employment of a taxpayer away from his home be temporary in contemplation at the time of its acceptance but also that it not be indeterminate in fact as it develops. Respondent first argues that there is no evidence that petitioner's employment was initially expected to last for a short time. As noted above, however, we find the record clear that petitioner's initial expectation and that of his employer was that the Detroit employment would last about 11 months. Respondent does not argue that 11 months is substantial or indefinite and we find under the facts and circumstances of this case that 11 months is temporary employment. Respondent next argues that the employment as it developed was in fact indeterminate. We do not agree. The record is clear that petitioner's expectations as the Detroit employment progressed were always such that he reasonably expected the employment to end within a period of 11 or less months. Thus, the employment never became indeterminate in fact. [9] See Michaels,supra at 273; Dowd,supra at 409-410. Respondent further argues that because representatives of Leasco discussed *510 with petitioner the possibility of moving to Detroit soon after he was assigned to the Detroit-Edison project, petitioner's employment in Detroit was not temporary. However, even if petitioner had moved with his family to Detroit we would conclude on this record that his employment in Detroit was temporary. Such a move might have affected the amount of petitioner's expenses in Detroit and to what extent his employer would reimburse him for those expenses, but not whether his employment was temporary. See Dowd,supra;Michaels,supra.
*511 Respondent also argues that petitioner had no business reason for moving to Dallas and that, therefore, we should hold that all expenses incurred by petitioner while working in Detroit after his move to Dallas were not employee business expenses. The evidence in this case, however, is to the contrary. Petitioner's supervisor, on behalf of petitioner's employer, Leasco, requested that petitioner move to Dallas because it had sufficient airport facilities, it was an area in which Leasco was expected to have a number of new contracts, and it was the home of another utility software consulting firm that was interested in merging with Leasco. The record amply supports finding that petitioner's move to Dallas, as distinguished from the time of the move which we will discuss subsequently, was for business purposes. We therefore conclude that petitioner had deductible travel expenses for each of the years 1972 and 1973 to the extent of the reimbursement he received for such expenses from his employer. Of course petitioner is not entitled to take the deduction unless he includes in income the amount of the reimbursements. In effect, the result is the same if petitioner does not include *512 in income the reimbursement and does not take the deduction. Respondent in the alternative argues that even if Detroit employment was temporary and the move to Dallas was for the benefit of petitioner's employer, petitioner's deduction for travel expenses in 1972 should be limited to the amount of expenses which he would have incurred had he remained in Canton until the end of 1972. Petitioner testified at trial that he did not know why he moved to Dallas in June of 1972 instead of December of 1972 when the Detroit employment was expected to end. Similarly, a representative of Leasco testified that he too did not know why the move was made in June. Both suggested in their testimony that it was personally a more convenient time for petitioner, who had school-age children, to move. The Court tried at length to obtain an explanation from petitioner as to why he moved in June instead of at the end of the year 1972, but the only explanation forthcoming was that June was a time more personally convenient for him to move.There is nothing in this record to show any business reason for petitioner moving to Dallas in June 1972 rather than at the end of the year 1972. If Leasco had directed *513 petitioner to move from Canton to Dallas in June 1972, it would seem that Leasco would have paid the additional air fare from Dallas to Detroit as it did in 1973, even though Leasco was operating under a fixed cost contract with Detroit-Edison in 1972. We therefore conclude that the 1972 unreimbursed expenses of $2,542 representing the excess air fare of the Dallas-to-Detroit flights over the Canton-to-Detroit flights were not incurred by petitioner in the pursuit of a trade or business and are not deductible by petitioner under section 162(a)(2). Flowers v. Commissioner, supra.
Respondent's only argument that petitioner's moving expenses are not deductible, other than his contention that petitioner's employment at Detroit was not temporary, is that petitioner did not commence work at a new principal place of work within the meaning of section 217. [10] Respondent argues that petitioner presented no evidence that he commenced work in Dallas.In his argument under section 217, respondent argues only that petitioner's principal place of work was at all pertinent times, within the meaning of that section, in Detroit. [11]
*514 A taxpayer's principal place of work for section 217 purposes is generally the same as the taxpayer's principal place of business for section 162 purposes. Section 1.217-2(c)(3)(i) and (iii), Income Tax Regs.; cf. Schweighardt v. Commissioner, 54 T.C. 1273, 1277 (1970), wherein we upheld, with the following language, section 1.217-1(c)(3)(iii), Income Tax Regs., which applies to taxable years prior to January 1, 1970: In our view respondent's regulation providing that in general a place of work is not to be considered a taxpayer's principal place of work under section 217 if a deduction is allowable for traveling expenses while away from home under section 162 is a reasonable interpretation of the statute. The reference in section 217 to a new "principal place of work" means a new place where the taxpayer will be employed on a permanent or indefinite basis as distinguished from a temporary basis. This is the interpretation of the reference to a new "principal place of work" adopted in respondent's regulation.* * * Thus, we find no merit in respondent's position that Detroit was petitioner's principal place of work within the meaning of section 217 when we *515 have above held that his employment in Detroit was temporary. Although we have held that petitioner has failed to show that he was required by his employer or it was otherwise necessary for him to move from Canton to Dallas in June 1972, as distinguished from the end of the year 1972, in our view the moving expenses were incurred in connection with petitioner's commencement of work in Dallas.Petitioner's moving to Dallas at the request of his employer and going from Dallas to such places as his employer directed was "commencement of work" as an employee of Leasco in Dallas. Section 1.217-2(a)(3), Income Tax Regs., defining "commencement of work," gives, as one example of "commencement," the "beginning of work by a taxpayer for the same employer * * * at a new location." Petitioner certainly began working for Leasco out of Dallas soon after his move to Dallas. Section 1.217-2(c)(3) of the Income Tax Regulations in defining "principal place of work" includes within the definition the place where an employee is required by his employer to "base" his employment. The record here shows that petitioner was required by Leasco to "base" his employment out of Dallas. We therefore conclude *516 that petitioner "commenced" work for Leasco in Dallas, Texas, within the meaning of section 217(a). We hold that petitioner's moving expenses are deductible under section 217. Since petitioner was reimbursed by his employer for his moving expenses and did not include the amount of the reimbursement in income, our holding in effect is a holding that petitioner's 1972 income is not to be increased by the amount of his moving expense reimbursement. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years involved. ↩
2. On brief, respondent concedes that the negligence penalty under sec. 6653(a)↩ should not be imposed.
3. Leasco employees received payroll and expense checks from any of four interrelated corporations during the October 1971 through October 1973 time period. The four companies were Leasco, Leasco Response, Leasco Capital, and Operations Research, Incorporated. Petitioner's position as a Leasco employee, however, did not change during this time.↩
4. Although petitioner's expense report to Leasco shows the date as October 29, it is clear from the record that the date was November 29, 1971.↩
5. The parties stipulated that petitioner was reimbursed $1,891.80 for his relocation expenditures. The records, however, show that he spent $1,913.87 and reported that amount to Leasco. The parties have not explained this discrepancy and we therefore accept the stipulated figure.↩
6. Whether petitioner worked in Detroit most weeks until June 16, 1973, however, is not clear from the record. The expense records provided show no expenses from February 18, 1973, until June 16, 1973. Petitioner, however, did testify that he worked on the April rate change proposal and the stipulated Detroit expenses for 1973 are seven or eight thousand dollars higher than those of the expense records provided. The parties also stipulated that petitioner returned to Dallas most or all weekends from June 1972 to December 1973. In any event, it is clear that in 1973 he worked on no project other than Detroit-Edison until June 16, 1973. ↩
7. What petitioner did during the workweek of July 3 through July 7 is not shown in the record.↩
8. Sec. 274(d) provides that a taxpayer shall not be entitled to a deduction for traveling expenses under sec. 162 unless detailed substantiation of the amounts claimed to be deductible is provided. Respondent concedes that petitioner in this case has satisfied the substantiation requirements of sec. 274(d).Also, respondent does not question whether petitioner's expenses of returning to his family home each weekend exceeded the cost he would have incurred if he had stayed at the place he was working. See Rev. Rul. 54-497, 1954-2 C.B. 75↩, 82. We therefore have no question of the amount of the deductions in this case to the extent they may be considered ordinary and necessary business expenses of petitioner incurred while he was away from home in pursuit of a trade or business.
9. Respondent would have us test petitioner's expectations of employment duration by viewing his knowledge of the emploment term at the time he filed the Federal income tax returns for the years in question. He argues that petitioner had been employed in Detroit for 18 months when he filed his 1972 return and almost two years when he filed his 1973 return. Therefore, he argues his employment had become indefinite due to "changed circumstances and the passage of time." While we agree that the passage of time and changed circumstances can change temporary employment into indeterminate employment, the facts of this case are such that the employment remained temporary. Respondent makes no attempt to distinguish or explain Dowd or Michaels and we find the present case to fall within the holding of each. We find nothing in the cases cited by respondent that would require a contrary result. See Boone v. United States, 482 F.2d 417 (5th Cir. 1973); Chwalow v. Commissioner,470 F.2d 475 (3d Cir. 1972), affg. a Memorandum Opinion of this Court; Jones v. Commissioner,444 F.2d 508 (5th Cir. 1971), affg. 54 T.C. 734 (1970); Ham v. United States,408 F.2d 671 (6th Cir. 1969); Commissioner v. Peurifoy,254 F.2d 483 (4th Cir. 1957), affd. per curiam, 358 U.S. 59 (1958); Ford v. Commissioner,227 F.2d 297 (4th Cir. 1955), affg. a Memorandum Opinion of this Court; McCallister v. Commissioner,70 T.C. 505 (1978); Kroll v. Commissioner,49 T.C. 557 (1968). Respondent also notes that under Rev. Rul. 60-189, 1960-1 C.B. 60, 63, an actual duration of one or more years indicates other than temporary employment. Even if such a rule were adopted by this Court, which it has not been, it would only be an indication and under all the facts and circumstances of the present case we would still find the employment temporary. See Michaels,supra;Dowd,supra.↩
10. Sec. 217(a) provides as follows: SEC. 217. MOVING EXPENSES. (a) Deduction Allowed. -- There shall be allowed as a deduction moving expenses paid or incurred during the taxable year in connection with the commencement of work by the taxpayer as an employee or as a self-employed individual at a new principal place of work. ↩
11. Petitioner makes no mention of the sec. 217 question in either of his briefs. Apparently, he believes that the solution to the temporary versus indefinite question under sec. 162(a)(2) will dictate the result of the sec. 217 question.↩